ST. JAMES. The (ROBERTS v.). See Case No. 11,914.

═══════════

## Case No. 12,223.

### The ST. JOHN.

#### [2 Ben. 192.] [1]

District Court, S. D. New York. March, 1868. [2]

COLLISION—IN THE HUDSON RIVER—WHISTLES —LOOKOUT.

1. Where a steamboat coming down the Hudson river from Albany, on rounding Magazine Point, saw the lights of a towboat below, which was going up on the east side of the river, and the pilot of the steamboat blew two whistles, whereupon the towboat answered with two whistles and starboarded her wheel, expecting that the steamboat would pass to the eastward of her, but the latter struck a barge on the port side of the towboat, the collision occurring

─────────

[1] [Reported by Robert D. Benedict, Esq., and here reprinted by permission.]

[2] [Modified in Case No. 12,224. Decree of circuit court affirmed by supreme court in 154 U. S. 586, 14 Sup. Ct. 1170.]

about the middle of the river, and the steamboat having no lookout forward outside of the pilot house: *Held*, that the towboat was right, on hearing the two whistles of the steamboat, in starboarding her helm, and was not in fault.

2. The pilot of the steamboat misjudged the position of the towboat, supposing she was on the west shore, instead of on the east shore, and such mistake was the cause of the collision.

3. The steamboat was also in fault in not having a proper lookout.

In admiralty.

Beebe, Dean & Donohue and C. Swan, for libellant.

Charles Jones, for claimants.

BLATCHFORD, District Judge. This is a libel filed by Abraham E. Hasbrouck, owner of the barge Ulster County, for a collision which took place on the Hudson river, near West Point, about 3 o'clock in the morning of the 20th of November, 1864, between the steamboat St. John and the barge. The St. John was on a trip from Albany to New York, having left Albany about eight o'clock on the previous evening, and run to the place of collision, a distance of about one hundred miles, in seven hours, at a speed of over fourteen miles an hour. The Ulster County was in tow of a propeller called the Pluto, and was lashed to the port side of the propeller, there being another barge lashed to the starboard side of the propeller, and a canal boat in tow astern of the latter barge. The Pluto and her tows had left New York, bound to New Paltz, in Ulster county, opposite Poughkeepsie, about five o'clock on the previous afternoon, and had run to the place of collision, a distance of about fifty miles, in ten hours, at a speed of about five miles an hour. The night was light, the weather was clear, the tide was about half flood, and there was scarcely any wind. The propeller, with her tows, went up on the east side of the channel of the river, in the usual and proper course for such vessels, until she reached a point nearly opposite West Point, but a little below it. The river runs from Albany southward, and, just above West Point, it turns abruptly to the eastward, around a point called Magazine Point, and, after running in an easterly direction for a short distance, it turns abruptly to the southward around West Point. Magazine Point being on the left bank of the river and West Point on the right bank. The pilot in charge of the Pluto was on the lookout for the St. John, her regular time for leaving Albany being known. The Pluto was going very slowly, being close shut off. As the St. John came down and turned around Magazine Point, and headed to the eastward, the pilot of the Pluto saw her. If the Pluto had kept on the course she was then on, the St. John would have passed to the westward of her and her tows, and there would have been no collision, for the Pluto was well to the east side of the river; and,

although the usual course of the St. John was to take rather a wide sweep around West Point, because she was a large boat, in order to get a proper turn and not collide with small vessels along the western shore below West Point, yet she would usually go down in the middle of the river after she had got her turn around West Point. The pilot of the St. John, as soon as she came around Magazine Point and headed to the eastward, saw the light of the Pluto, and sounded two whistles for the Pluto to keep to the left. The pilot of the Pluto immediately replied by two whistles, and starboarded his helm, and got his head to north-northwest, running to the left, and expecting that the St. John would pass to the eastward of him, as indicated by her two whistles. But the St. John came on, and her stem struck the Ulster County on her port bow and sunk her. The force of the blow was such as to part all the lashings which fastened the barge to the tug, and, although the St. John had slowed and stopped her engine, and reversed it, before she struck the barge, yet she had on sufficient headway, with the enormous bulk of a steamer over four hundred feet long, which had been running at a speed of nearly fifteen miles an hour but a short interval before, to cut into the barge a distance of some ten feet. It is claimed, on the part of the St. John, that no answering whistles from the Pluto were heard on board of the St. John, and that, in consequence, after slowing, she blew two whistles a second time, and, getting no response to them, stopped her engine and reversed it. But the evidence is satisfactory that the Pluto did answer promptly by two whistles, and did starboard her helm, and it does not appear that the St. John took any different course after she blew her first two whistles from what she would have taken if she had heard a response to them, or that her movements or courses were at all influenced by her failure to hear a response from the Pluto. The St. John kept on without reference to where the Pluto was or the course she was taking, and ran into her. It is very clear, on the evidence, how and why the collision happened. When the pilot of the St. John sighted the light of the Pluto across the land of West Point, he entirely mistook her position. He admits that he thought she was over to the west shore. So believing, he signaled to her to keep toward the west shore, and that the St. John would go to the eastward of her. The Pluto obeyed, and headed accordingly, and had got over to the middle of the river, in her progress from the easterly side of it toward the westward, when the collision occurred. All the testimony agrees that the collision happened at nearly the middle of the river, and the witnesses from the St. John admit that they found the Pluto further to the eastward than they supposed she would be. It is manifest that the sole cause of the collision was the mistaking by the St. John of the position of the Pluto and her tows, and the mistaken signal which the St. John gave for the Pluto to keep to the westward, which signal, in the position the Pluto was in, was properly answered by the starboarding of her helm. The St. John was wholly in fault, and the Pluto and the Ulster County were free from fault. The Pluto, as soon as a collision appeared inevitable, slowed and stopped, and used all proper means to avoid it.

The St. John had no proper lookout. The only persons on the lookout on board of her were those in the pilot house, and they mistook the position of the Pluto. It has been again and again decided that the pilot house is not a proper station for a lookout, and this case adds another forcible illustration of the propriety of the well-established rule. If a proper, experienced, and competent lookout had been stationed on the bow of the St. John, engaged in that duty alone, with his attention not distracted by other duties, the presumption is that he would have correctly discerned the position of the Pluto, and that the collision would not have occurred.

There must be a decree condemning the St. John in damages, with a reference to a commissioner, to ascertain and report them.

[On appeal to the circuit court, the decree of this court was modified. Case No. 12,224. An appeal was then taken to the supreme court, where the decree of the circuit court was affirmed. 154 U. S. 586, 14 Sup. Ct. 1170.]